UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20757-CR-MARTINEZ

UNITED STATES OF AMERICA,

   Plaintiff,

v.

KAREN KALLEN-ZURY et al,

   Defendants.

_____/

## DEFENDANT KAREN KALLEN-ZURY'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PRESENTENCE REPORT

Defendant Karen Kallen-Zury, and pursuant to U.S.S.G. 6A1.2-3, p.s., Fed. R. Crim. P. 32(d), (e)(2) and (f), and the Fifth Amendment to the United States Constitution, respectfully registers her Objections/Clarifications to the Presentence Investigation Report ("PSR") and Memorandum in Aid Sentence and as grounds therefore, states as follows:

## I.  Introduction

It is no easy task for this Court to impose a sentence on a defendant, especially a defendant like Karen Kallen-Zury.  We hope that through this memorandum and the presentation at sentencing the Court will agree that a significant variance is warranted in this case. We will at the outset of this pleading address why a variance is appropriate. We will later identify our objections to the PSR.

Mrs. Kallen-Zury's history and characteristics present very strong reasons for this Court to impose a substantial variance in this case.  Mrs. Kallen-Zury is a 60 year old first-time offender, a daughter, a wife, and a mother, who had never been arrested, let alone incarcerated,

before October 4, 2012.  She presents no risk to re-offend.  Unlike other fraud cases, and specifically other Medicare fraud cases, Mrs. Kallen-Zury operated for years viable businesses that rendered real services to people in need.

After a six week trial, the jury, in little more than two days of deliberation, returned guilty verdicts on a Friday afternoon against her and three co-defendants.  Mrs. Kallen- Zury now stands convicted of multiple counts of conspiracy, wire fraud, health care fraud, and health care bribes and kickbacks.  **The PSR suggests a total offense level 47 and an advisory guideline sentence of Life Imprisonment, limited only by the statutes to 2,040 months, or 170 years. The Government attorneys argue for an even higher Guidelines level.**  According to the United States Sentencing Commission's Sourcebook on federal sentencing statistics FYE 2012, of 84,173 cases sentenced that year, only 0.50% of all cases faced a total offense level 43 and a Life sentence.[1]  **We believe such a sentence would not only subject Mrs. Zury to incarceration for the remainder of her life; it would preclude her designation to the minimum security facility.**  We believe that should a sentence be imposed, as suggested by the PSR and, we expect, by the Government, Mrs. Kallen-Zury may very well find herself incarcerated with Criminal History Category V and VI offenders, at the United States Penitentiary at Hazelton, West Virginia, specifically, the Secure Female Facility, located in the mountains of Preston County, West Virginia, a lockdown type facility.

## II.     Section 3553(a) factors applied to this case.

We will not burden the Court with a lengthy explanation of the law relating to *Booker*,

---

[1]  The Sourcebook, at Tables 21 and 23, does not provide information on total offense levels that exceed level 43, but are limited pursuant to Chapter Five, comment. (n.2).

of which the Court is well aware.  Instead, we will focus on the Section 3553(a) factors and the issues important for the September 10, 2013 sentencing.

We briefly note that in considering the § 3553(a) factors, the sentencing guidelines are to be given no more or less weight than any other factor.  *See United States v. Jaber*, 362 F. Supp. 2d 365, 370-76 (D. Mass. 2005) (providing comprehensive analysis of why sentencing guidelines do not reflect statutory purposes of punishment); *United States v. Ranum*, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005); *see also United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) ("if *Booker* is to mean anything, it must be that the district courts are obligated to impose a reasonable sentence, regardless of the guidelines range, so long as the guidelines have been considered.").

Perhaps even more important, however, is that *Booker* establishes an independent limit on the sentence that may be imposed.  The primary sentencing mandate of § 3553(a) states that the courts must impose the minimally sufficient sentence to achieve the statutory purposes of punishment/justice, deterrence, incapacitation, and rehabilitation: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a) (2)].  18 U.S.C. § 3553(a).  This so-called "parsimony provision" is not simply a factor to be considered in determining sentence; it represents a cap above which the court is statutorily <u>prohibited</u> from sentencing—even where a greater sentence is described by application of the sentencing guidelines.  *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part).

A.      **Section 3553(a).**

18 U.S.C. § 3553(a) contains the seven (7) factors that this Court must now critically consider before imposing a sentence, and provides:

Factors to be considered in imposing a sentence —

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed shall consider —

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B) to afford adequate deterrence to criminal conduct;

     (C) to protect the public from further crimes of the defendant; and

     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

(5) any pertinent policy statement . . . ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Id.*

### B.    Application of the Seven Factors Set Forth in 18 U.S.C. § 3553(a) to Karen Kallen-Zury.

#### 1.    The Nature and Circumstances of the Offense.

Karen Kallen Zury has been found guilty by a jury of multiple counts of conspiracy, wire fraud, health care fraud, and health care bribes and kickbacks. The PSR suggests a total offense level of 47, and, although Mrs. Kallen-Zury is a first time offender assigned to criminal history category I, the PSR suggests a Life sentence, limited only by statute to 2,040 months, or 170 years.  Mrs. Kallen-Zury is not the usual kind of defendant to score so high. Defendants convicted of first degree murder, second degree murder, or involuntary manslaughter may score in the Level 43 or higher range.  Defendants that have kidnapped and sexually assaulted a child, committed air piracy, organized and lead a major international drug organization may score in the Level 43 or higher range.  A defendant that has promoted a commercial sex act with a minor or even engaged in unlawful activity involving nuclear material, weapons or biological agents with the intent to injure the United States or aid a foreign terrorist organization, will result in less than offence level 43.  The most striking comparison lies in the arson guideline of § 2K1.4.  A defendant who commits arson and, as a result,  creates a substantial risk of death or serious injury, and causes more than  $50,000,000 but not more than  $100,000,000 in property damage, results in  a total offense level less than level 43.. Mrs. Kallen-Zury has been convicted of health care offenses which, according to the Government, have resulted in a loss, for Guidelines purposes, of more than $50,000,000 but not more than $100,000,000.  (Unlike the arson offense described above, Mrs. Zury is subjected to the double counting of loss, § 2B1.1(b)(1) and 2B1.1(b)(8), and is past a level 43).

While Mrs. Kallen-Zury respects the jury's verdict in this case and the ongoing sentencing process, as stated earlier this is not the typical Medicare fraud defendant or Medicare fraud case that this Court sees all too often. Hollywood Pavilion was not established for the purpose of committing fraud.  It was not established for the purpose of billing Medicare for services never provided to beneficiaries and who did not medically need services.  Although the Indictment referred to acts in and after 2001, Mrs. Kallen-Zury's father bought Hollywood Pavilion 40 years ago as an 88 bed psychiatric hospital.  Mrs. Kallen-Zury joined her father in 1981, became the nursing home's administrator in 1984, and the hospital's administrator about a year or two later.   She eventually oversaw both facilities and their 250 employees. The psychiatric hospital was well regarded, and the nursing home has never been accused of any impropriety. The typical health care fraud offense does not involve a provider that sees thousands and thousands of patients, both inpatient and outpatient, and maintains an equal number of detailed medical records, like Hollywood Pavilion.  The typical health care fraud offense cannot produce so many glowing letters from patients praising the services and care they received from the provider, like Hollywood Pavilion.

The typical health care fraud defendant does not provide employment for 250 employees and financial support for them and their families.  Nor does it enter into legal contracts with its professional staff, including marketing and case managers. The typical health care fraud defendant does not pay highly respected outside law firms for legal advice.

The typical health care fraud defendant does not usually pay, what the Government claims are kickbacks, by check, and never cash.  It does not record kickbacks openly, recording payments by the hour, by the month, and not tied to any particular number of patients. And it certainly does not keep track (again openly declared) who was referring them work, like

Hollywood Pavilion.

The typical health care fraud defendant does not file corporate tax returns and pay corporate income taxes.  Hollywood Pavilion had lots of employees and paid lots of salaries.  It had outside auditors, a chief operating officer, and a medical staff.  It had an organizational structure.  The typical health care fraud defendant is not and does not operate like a business. Hollywood Pavilion has operated as a business for more than 40 years.

The typical health care fraud defendant does not usually employ credentialed doctors, nurses and therapists performing legitimate services making people feel better.

The typical health care fraud defendant does not, through her businesses, contribute financially to the Mental Health Association of Broward County, the Alzheimer's Association, the School Board of Broward County, Soroptimist International of Davie, American Heart Association, Women in Distress, Harvest Fire Ministry, and many schools and universities. Criminal purposed businesses do not receive awards from the Broward County Department of Activities and Athletics for "continued outstanding support of student leadership development" and do not coordinate fundraisers among their employees for the benefit of Haiti after natural disasters. The typical health care fraud defendant does not offer facilities to interns and provide supervision and direction in both inpatient and out-patient services while they are training to be licensed.

Saying all this is not intended to argue against the jury verdicts. Our focus is a fair and appropriate sentence. The point is that as this Court crafts its sentence, the Court is dealing neither with the typical health care fraud offense nor the typical health care fraud defendant. Worse, the Court is dealing with a Guidelines computation driven by a dollar loss figure that in no way relates to true culpability.

### 2.      Personal and Family History

Karen Kallen-Zury is a 60 year old native of New York and a first-time offender, having never before been arrested for anything. She is the daughter of Herbert and Leonore Kallen, the sister of Phillip and Kenneth Kallen, the wife of Tamir Zury for almost 20 years, and the mother of 16 year old Aaron. While Mr. Zury and Mrs. Kallen-Zury are happily married and co-parent Aaron, Mrs. Kallen-Zury is the primary caretaker of their adopted son. Aaron suffers from ADHD and requires extra attention. Mrs. Kallen-Zury is better equipped at handling her son's illness than her husband. As a result, the care of Aaron is primarily left to her.

Mrs. Kallen-Zury was raised in the Roslyn area of Long Island, New York, and she lived there until she was 16 years old. Her parents enjoyed a wonderful marriage for 62 years until her father died in March 2005, at age 85. Her parents both earned licenses as nursing home administrators, and Mrs. Kallen-Zury's parents worked together in early years when her father first began to purchase and manage nursing homes in the New York area.

Mrs. Kallen-Zury experienced a good childhood. She grew up in an upper middle income neighborhood, she attended public schools, and she was a good student. Her father began to purchase and then manage nursing homes in the 1960s, when Mrs. Kallen-Zury was still a teenager. When she was about 16 years old, he bought a 400 bed facility in Smithtown, located in Long Island, and he moved the family to Smithtown to be closer to his work.

Mrs. Kallen-Zury completed high school in 1971, and she left home to attend George Washington University in Washington, D.C. She lived in a dormitory during her freshman year, but she missed living in New York and she missed her family. By her sophomore year, she transferred to New York University (NYU) and she had her own apartment in Manhattan for three years until she earned an undergraduate degree in communications in 1975.

It was during her years at NYU that Mrs. Kallen-Zury's father bought Highridge Management Corporation, which also owned Hollywood Hills Nursing Home and Hollywood Pavillion.  At the time, the nursing home had about 100 beds and the hospital 88 beds.  Mrs. Kallen-Zury's father also had facilities in Connecticut, and although his home base remained in Long Island, he maintained apartments in South Florida and Connecticut and he traveled often to manage his holdings. By 1973, Mrs. Kallen-Zury would vacation in South Florida and stay in her father's apartment.

Mrs. Kallen-Zury was 22 years old when she completed college and, although her father hoped she would join the family business, she resisted for sometime.  She remained in Manhattan and worked for radio stations and media outlets and, in 1981, at age 28, when she was earning about $16,000 a year, she agreed to work with her father.  At that time, Mrs. Kallen-Zury's father was in his 60s, he had grown very successful, but he was working very hard and he traveled constantly.

Mrs. Kallen-Zury came to South Florida with her mother in 1981 to learn the family business.  She was 28 years old.  She spent the beginning months at her parents' apartment and then found her own in Lauderhill.  She began in the admissions department and then became the assistant administrator for social services and activities.  In 1984, her father needed to replace the administrator of Hollywood Hills Nursing Home and told his daughter she was ready.  Mrs. Zury had already received her nursing home administrator's license and she took over what was now a 152 bed facility and its 150 employees.

In 1985/1986, Hollywood Pavilion's administrator retired.  Mrs. Zury hired two assistant administrators and took over both facilities and their 250 employees. She also bought her own townhouse at that time.  She was still in her early 30s.  She married David Viglione in May 1989.

It was her first marriage and she was one month shy of her 36th birthday. However, the marriage barely lasted a year.

In the summer of 1989, Mrs. Kallen-Zury bought a home at 2823 NE 26th Place in Fort Lauderdale, and she lived there until 1996.  During those years, she became the CEO of Hollywood Pavillion, a change in title only, and her father became Chairman and President.  On January 5, 1994, she married her present husband, Tamir Zury, and together, they adopted Aaron, who was born March 7, 1997.   By then, Mrs. Kallen-Zury and her family had moved to 2840 NE 37th Court in Fort Lauderdale.

By 2001/2002, Mrs. Kallen-Zury made the decision to pull back a little from her responsibilities at Hollywood Pavilion and Hollywood Hills Nursing Home because she wanted to spend more time with her son and be involved in his school.  Administrators were hired for the facilities and her brothers began to manage the Connecticut facilities, which enabled her father to spend more time in South Florida.  She and her husband bought their current home in Lighthouse Point in November 2004.

Mrs. Kallen-Zury's father died of cardiac arrest in March 2005.  He had worked up until the time of his death, at age 85.[2]  Her father's death caused her to return full-time to the family business.   From 2005 until 2009, Mrs. Kallen-Zury was responsible for the South Florida facilities, as well as the Norwich and Fountainview facilities in Connecticut. During those years, she fought a bout with shingles that affected her face and required treatment by an ophthalmologist.  By 2009, a family trust was established which separated the South Florida and Connecticut facilities and responsibility for the latter was assumed by Mrs. Kallen-Zury's

_____

[2] Mrs. Zury has suffered from severe anxiety symptoms since her father's death and her problems have only grown worse with legal problems which first began in 2008.  She has seen several psychiatrists, psychologists and therapists, and she has been prescribed a variety of medications during these years.

brothers. By that time, an active OIG investigation of the Hollywood facilities was under way. Mrs. Kallen-Zury lived under that cloud, not knowing the future of the family business, let alone her own future, until her arrest four years later on October 4, 2012.  At 6 AM on that date, FBI agents arrived at her home and placed her under arrest.  Her assets were frozen and she was ordered to have no contact with her facilities and/or its employees.   Three bond hearings were held and she spent five nights, three of which were spent in the SHU at FDC because general population did not have sufficient capacity to house Mrs. Kallen-Zury, before she was released on bond on October 9, 2012.  A six week trial began on May 20, 2013, a guilty verdict was returned on a Friday afternoon after two plus days of deliberation, and sentencing is now set for September 10, 2013.

### 3.    Policy considerations

**(a)    Mrs. Kallen-Zury is a 60 year old first time offender facing a lifetime sentence under the advisory guidelines.**

Because the guidelines fail to consider the length of time a defendant refrains from the commission of her first crime, Mrs. Kallen-Zury may receive some consideration in sentencing, pursuant to *United States v. Ward,* 814 F. Supp. 23 (E. D. Va. 1993), which recognized that a departure was warranted because the guidelines failed to consider that Ward had not committed his first offense until he was 49 years old.  This argument is applicable here.

Mrs. Kallen-Zury also believes this Court may consider that as a first-time offender at age 60, and already facing physical and mental health issues, she presents a lower risk of recidivism than most offenders.  In *United States v. Lucania,* 379 F. Supp. 2d 288, 297 (E.D. N.Y. 2005), the district judge found that "Post-*Booker* courts have noted that recidivism is markedly lower for older defendants" and in *United States v. Nellum,* 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)(unpub.), the court cited lower recidivism rates for older defendants and

granted a downward departure.  In this case, Mrs. Kallen-Zury asks that this be considered as a sentencing factor under 18 USC § 3553 in fashioning a reasonable and not greater than necessary sentence.

### (b) Mrs. Kallen-Zury's medical condition.

Mrs. Kallen-Zury was diagnosed with arrhythmia in 2008, she was diagnosed with post-fibula tendinitis and has limited use of her left foot, at times, she takes blood pressure medication, and she already had a bout with shingles. Her cardiologist, Dr. Kashmira Bradha, has prescribed Indapamide, Metoprolol and Potassium. He has written a letter, dated July 18, 2013.

> Ms. Karen Zury has been a patient in this office since May 2008. She saw me for cardiology evaluation on account of a history of hypertension, family history of premature coronary artery disease in her dad and a history of palpitations.  She also has a history of anxiety and depression.  The palpitations appear to be worse with stress as well as with caffeinated products.

Mrs. Kallen-Zury also has a history of mental/emotional problems and psychiatrist Richard Faulk has prescribed her Zoloft, 100 mg twice daily, and Clonazepam, 0.5 mg twice daily.  She also receives psychotherapy from her therapist, Dr. Marie Rodgers.  Her current level of anxiety is severe.  Dr. Faulk has written this Court, on July 18, 2013, the following:

> If Mrs. Kallen-Zury is incarcerated, she is very likely to experience a worsening of her mental health and an increase in her anxiety symptoms.   She also requires ongoing psychiatric and psychological treatment and it may be more difficult to obtain the level of care she is currently receiving, if she is in a prison environment.   Please take these factors into account when considering sentencing arrangements.  Thank you.

Pursuant to the most recent amendment (739) to §5H1.4, a defendant's  physical condition, individually or in combination with other offender characteristics, such as age and the length of any expected sentence, may be considered as sentencing factors in fashioning a

reasonable but not greater than necessary sentence.

In an August 21, 2006 memorandum to all district court judges, the Administrative Office of the U.S. Courts indicated that the Bureau of Prisons will consider the presentence investigation report, the statement of reasons and judicial placement recommendations in assigning a CARE level to an inmate.  There are four levels in the BOP CARE level system, which classifies inmates according to their healthcare needs.  At 60 years of age and given Mrs. Kallen-Zury's physical and mental health history, we believe she is already precluded from Level 1.  Level 2 is reserved for inmates who are stable out-patients, who can handle their own daily living activities, and their need for acute medical services is less than three months in duration, occur no more than every two years, and can ne resolved without hospitalization. Level 3 is reserved for inmates who are fragile out-patients and Level 4 is for inmates with acute medical conditions.   At Mrs. Kallen-Zury's current age and health, and the sentence the government is seeking, Mrs. Kallen-Zury will eventually find herself at higher CARE levels in the years to come. During those years, her advancing age and increasing health conditions will certainly tax the resources and finances of the Bureau of Prisons, place an added risk to the inmate, and may exacerbate present conditions.   Even when the sentencing guidelines were mandatory, downward departures under §5H1.4 were permissible. Mrs. Kallen-Zury asks that her age and health be considered as sentencing factors under 18 USC § 3553 in fashioning a reasonable and not greater than necessary sentence.

(c)      **Mrs. Kallen-Zury's Family Ties**

The PSR suggests a guideline range which is a Life sentence for Mrs. Kallen-Zury. Should a sentence be imposed which approaches what the PSR suggests, Mrs. Kallen-Zury will face BOP conditions seldom seen by female defendants convicted of health care fraud in the

Southern District of Florida.

Pursuant to BOP p.s. 5100.08, both the length of sentence proposed here and a finding that Mrs. Kallen-Zury was an organizer/leader in this conspiracy will very well preclude her from the minimum security camp at Coleman, located just north of Orlando. According to the BOP, low and medium security facilities for women are few-- there are five and only Tallahassee is located within the BOP's Southeast Region.[3] Outside this region are FCI Danbury, located in Southwest Connecticut, FCI Waseca, located in Southern Minnesota, FCI Tucson,[4] located in Southern Arizona, and FCI Dublin, located in Northern California.

A sentence suggested in the PSR will not only subject Mrs. Kallen-Zury to incarceration for the remainder of her life; it will find her incarcerated, along with not only first-time offenders, but Criminal History Category V and VI offenders, most likely at the United States Penitentiary at Hazelton, West Virginia, specifically, the Secure Female Facility, located in the mountains of Preston County, West Virginia.

Mrs. Kallen-Zury is aware that visiting hours are generous and always encouraged by officials of the Bureau of Prisons. The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and develop closer relationships between the inmate and family members or others in the community (see BOP p.s. 5267.07). Further, according to BOP p.s. 5267.08B, last revised on July 15, 2009, inmates at the FCIs (low and medium security) receive visits from 8 AM until 3PM, Friday through Sunday and federal holidays, they are normally entitled to up to six visitors at a time, and inmates normally receive 35 visit points a month. (One visit point equals a visit of an hour or fraction thereof.) Visits at

[3] FCI Tallahassee is an RDAP facility and those who have been recommended for this program have preference over Mrs. Zury for designation purposes.

[4] FCI Tucson is a women's medium security facility.

USP Hazelton are less generous.  Worse, Mrs. Kallen-Zury's mother is now 90 years old, she

lives in a life care community, and she has a live in aide.  Mrs. Kallen-Zury will never again see

her mother should a sentence be imposed consistent with what the *advisory* guidelines suggest.

Further, Mrs. Kallen-Zury's only child, 16 year old Aaron most certainly will not see his mother

much in the years to come.  Mrs. Kallen-Zury asks this Court to consider these factors when

fashioning a reasonable but not greater than necessary sentence.

#### (i)        Karen Kallen-Zury is deeply loved and respected.

Attached hereto as Exhibit A are a wide array of letters from family, friends, colleagues,

and employees on Mrs. Kallen-Zury's behalf.  The sentiments in these letters are consistent and

strong: Mrs, Kallen-Zury is a good, honest person who should not go to jail.  Here are just a few

highlights of what the letters repeatedly emphasize about Mrs. Kallen-Zury:

- She is a noble, humbke and caring individual.  I strongly feel that sentencing Karen to any amount of time in prison would only cause our community to lose an indispensible citizen who could continue to be a valuable asset for years to come.  – **Carmen Huertas Alcantara, employee.**

- On more than one occasion, Karen sacrificed personal gain for the benefit of other family members. … the fabric of her character is one of an honest, caring person that will put other peoples interest first.  – **Ken Bryant, tax advisor to Kallen family.**

- I feel confidant saying that Karen Kallen-Zury is a woman of integrity and honesty.  – **Grace Kaye, friend.**

- Karen is a wonderful, caring person.  She is an amazing daughter, wife and mother, and she runs a wholesome, healthy home.  – **Charles David Kirsch, friend.**

- This individual is one of the straightest and honest people I have ever met.  In fact, sometimes her forthrightness is a quality that can be grating.  She is always looking for the safest and most conservative path in business, and her personal life. – **Phil Kallen, brother.**

- My mother truly loves Hollywood Hills and Hollywood Pavilion.  She ran her business with amazing ethics and efficiency, while also maintaining a family oriented relationship with the residents, patients, family members, and staff.  But as far as I can remember, my mother always taught me that the residents came first.  Our tiny, little, family-owned business was built around her love for her extended families, her nobility, and her genuine concern for the well-being of others.  – **Aaron Robert Zury, son.**

### 4. Rehabilitation, Deterrence and Recidivism

The risk of Mrs. Kallen-Zury reoffending is highly unlikely.  Specifically, the Sentencing Commission's report, "Measuring Recidivism" offers a statistical analysis of the type of person most likely and least likely to re-offend.  The study demonstrated that (1) those who are married are less likely to recidivate than those who were not; (2) those who have not used illicit drugs are less likely to recidivate than those who did; (3) non-violent offenders are less likely to recidivate than violent offenders; (4) first time offenders are less likely to recidivate than repeat offenders; (5) those who are employed are less likely to recidivate than those who are not employed; and (6) those who are sentenced to non-jail sentences are less likely to recidivate than those who receive straight jail.  Mrs. Kallen-Zury falls into all of those categories.

At the age of 60, we believe even the government should concede Mrs. Kallen-Zury poses little risk to re-offend and she is not in need of rehabilitation. We also believe she has suffered consequences, such that a sentence is not needed to provide further deterrence.  Mrs. Kallen-Zury has lost her reputation, her ability to operate her business, and everything her father worked for – his legacy.  However, Mrs. Kallen-Zury knows this Court must fashion a sentence that serves as a deterrent to others who might be considering engaging in criminal conduct similar to what a jury has now found she involved herself.  We believe that any examination of what has become of Mrs. Kallen-Zury's life and the years she will surely spend in prison will serve as an adequate warning to others.  A sentence which may very well place her in a high security prison far from her loved ones, a sentence that may very well insure she is never reunited with those loved ones, is hardly a reasonable and/or not greater than necessary sentence in a case such as this.

### 5. The Minimally Sufficient Sentence.

Section 3553(a)(2) identifies four purposes a sentence should serve. The sentence imposed should reflect the seriousness of the crime; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational training, medical care, or treatment in the most effective manner. Given these considerations, Mrs. Kallen-Zury respectfully submits that a sentence of probation and that incorporates house arrest is appropriate and adequately fulfills the purposes of sentencing. As noted, Mrs. Kallen-Zury presents no risk of recidivism. General deterrence is amply served by the already severe impositions as well as the many consequences Mrs. Kallen-Zury has already received.

In determining the minimally sufficient sentence, this Court must essentially ask whether a more severe sentence will achieve greater justice and deterrence, incapacitation and rehabilitation. Respectfully, it will not in this case. In making this judgment, it is important to note that Mrs. Kallen-Zury has suffered as a result a great deal as a result of this prosecution. *See, e.g., United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 439-40 (E.D.N.Y 2002); *United States v. Redemann*, 295 F.Supp.2d 887, 894-97 (E.D. Wis. 2003); *United States v. Gaind*, 829 F. Supp. 669, 670-71 (S.D.N.Y. 1993).

### a. Proportionality Among the Sentences/Punishment of Co-Conspirators.

Additionally, there should be proportionality among the sentences and/or punishment of any co-conspirators. The statutory mandate that punishment be just and promote respect for the law incorporates the principle that "punishment should correlate with culpability . . . ." This means that in appropriate cases, a court has discretion to "align codefendants' sentences somewhat in order to reflect comparable degrees of culpability." *United States v. Martin*, 520 F.3d 87, 95 (1st Cir. 2008); *see also United States v. Simpson*, 2009 Fed.Appx. 279 (4th Cir.

2006) (unpub.) (affirming 29-month variance for extensive drug conspiracy, kidnapping, and aiding the brandishing of a firearm in light of sentences co-conspirators received.  The sentence was reasonable because the district court considered the sentences of co-conspirators who received an average 181 months).

In some cases, as here, the more culpable co-conspirators (in particular Keith Humes and the other marketers and Dr. Alan Gumer to name a few) are facing minimal jail time in part because of plea bargains, and less culpable co-conspirators like Mrs. Kallen-Zury are facing a life sentence.  The commands of justice and uniformity require a variance to equalize Mrs. Kallen-Zury's sentence with those of more or equally culpable co-conspirators, such as Keith Humes and Dr. Gumer, even if those defendants benefitted from a § 5K1.1 motion rewarding their cooperation.  Specifically, in *United States v. Zavala*, 300 Fed. Appx. 792 (11th Cir. 2008), the Eleventh Circuit affirmed a variance in a drug conspiracy from 262 to 178 months to ensure that the defendant received a lesser sentence than a more culpable defendant who benefitted from a § 5K1.1 motion. *Id.* at 794.  In *Zavala*, the court reasoned that the disparity arose because the more culpable defendant had information to provide to the government, but the less culpable defendant did not and therefore the district court correctly considered the disparities among the defendants.  *Id.*; *see also United States v. Lente*, 647 F.3d 1021 (10th Cir. 2011) (holding that it was procedurally unreasonable not to consider sentences of co-conspirators when fashioning a reasonable sentence).

Mrs. Kallen-Zury has low culpability in this case.  While Mrs. Kallen-Zury was the CEO of Hollywood Pavilion, she had minimal knowledge and involvement regarding the clinical operation of the hospital.  Mrs. Kallen-Zury had no involvement in billing Medicare or making claims to Medicare.  She had attorneys advising her and instructing her how to create

relationships with the marketers she hired.  In fact, her work efforts were often focused on the

nursing home and not Hollywood Pavilion.

**b.     Home Detention and/or Probation.**

Home detention can be a severe punishment.  It is hugely restrictive of liberty, highly

effective in the deterrence of crime, and amply retributive.  In fact, the Supreme Court in *Gall*

agreed with United States District Judge Pratt that probation is a "substantial restriction of

freedom."  552 U.S. at 47-48.  In particular, the Supreme Court stated:

> We recognized that custodial sentences are qualitatively more severe than
> probationary sentences of equivalent terms.  Offenders on probation are
> nonetheless subject to several standard conditions that substantially restrict their
> liberty.  *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the
> very nature of probation is that probationers 'do not enjoy the absolute liberty to
> which every citizen is entitled'") (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874
> (1987)).  Probationers may not leave the judicial district, move, or change jobs
> without notifying, and in some cases receiving permission from their probation
> officer or the court.  They must report regularly to their probation officer, permit
> unannounced visits to their homes, refrain from associating with any person
> convicted of a felony and refrain from excessive drinking.  U.S.S.G. § 5B1.3.
> Most probations are also subject to individual "special conditions" imposed by the
> court.  Gall, for instance, may not patronize any establishment that derives more
> than 50% of its revenue from the sale of alcohol, and must submit to random drug
> tests as directed by his probation officer.

*Id.* at 48-49 (footnote omitted).[5]  Judge Pratt explained that the defendant "will not be able to

change or make decisions about significant circumstances in his life, such as where to live or

work, which are prized liberty interests, without first seeking authorization from his Probation

---

[5]The *Gall* court noted that "'[p]robation is not granted out of the spirit of leniency . . . As
the Wickersham Commission said, probation is not merely 'letting an offender off easily,'" 552
U.S. at 48, n.4 (citing Advisory Council of Judges of National Council on Crime and
Delinquency, Guides for Sentencing 113-14 (1957), and "'the probation or parole conditions
imposed on an individual can have a significant impact on both that person and society . . . Often
these conditions comprehensively regulate significant facets of their day-to-day lives . . . They
may become subject to frequent searches by government officials, as well as to mandatory
counseling sessions with a caseworker or psychotherapist.'" *Id.* (citing 1 N. Cohen, *The Law of
Probation and Parole* § 7:9 (2d ed. 1999) (brackets omitted)).

C a r l t o n   F i e l d s , P. A.
Miami Tower - 100 Southeast Second Street, Suite 4200 - Miami - Florida  33131-2114 - 305.530.0050
19

Officer or, perhaps, even the Court.   Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term." *See id.*

Factor (a)(4) is intended to accord "flexibility" to sentencing judges by "provid[ing] alternatives to incarceration where necessary . . ."  *United States v. K*, 160 F.Supp.2d 421, 431 (E.D.N.Y. 2001).   Probation, home detention, and community service are available alternatives to imprisonment because they are permitted through variance.

Home detention represents a desirable alternative to imprisonment that is consistent with the underlying policies of the Guidelines.   The language from U.S.S.G. § 5H1.4 is instructive albeit in the context of departures.   That section states in appropriate cases, "home detention may be as efficient as, and less costly than, imprisonment."  *Id.*   That statement centers on the idea that when home detention is a sufficient and efficient punishment, considerations of cost may be entertained.   That policy is best understood in light of the history of the Guidelines.

The Sentencing Reform Act of 1984, Pub. L. No. 980473, § 211, 98 Stat. 1987, 1989-90 (1984), which created the United States Sentencing Commission and delegated to that Commission the authority to create the Guidelines, was enacted in part to address prison overcrowding.   *See K*, 160, F.Supp.2d at 432 ("What is often ignored in rigidly applying the current Guidelines, is another of the statute's aims—reducing prison overcrowding.").   Congress, in the Sentencing Reform Act, instructed the Commission to formulate the Guidelines "to minimize the likelihood that the Federal prison population will exceed the capacity of Federal prisons."  28 U.S.C. § 994(g).   "[U]ndergirding the federal sentencing reform movement was the notion that prison overcrowding or costly expansion could best be controlled through selective incapacitation and utilization of alternatives to incarceration in appropriate cases."  *K*, 160 F.Supp.2d at 432.   "Discretion to impose alternatives to incarceration was to be an important

means of eliminating prison overcrowding under the Act." *Id.*; *see also*, Edward M. Kennedy, *Prison Overcrowding: The Law's Dilemma*, 478 Annals of the American Academy of Political and Social Science 113, 120 (1985) ("These provisions evidence the clear congressional intent that the guidelines should not contribute to prison overcrowding but should help to bring prison populations in line with prison capacities."). As "[o]vercrowding and cramped living conditions are particularly pressing problems in many prisons, . . . 'the -soul-chilling inhumanity of conditions in American prisons has been thrust upon the judicial conscience.'" *Rhodes v. Chapman*, 452 U.S. 337, 356 (1981) (quoting *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 684 (D. Mass 1973)).

### 6.    Specific Grounds

The Supreme Court in *Booker* makes it apparent that sentencing courts must no longer ignore the individual characteristics of the person being sentenced, as the former mandatory guideline system required of courts. Specifically, the remedial majority in *Booker* directs sentencing courts to consider all of the § 3553(a)(1) factors, many of which the former mandatory guideline system ignored or rejected. For example, under § 3553(a)(1), a sentencing court <u>must</u> consider the "history and characteristics of the defendant." But under the former mandatory guideline system, courts were generally forbidden from considering the defendant's age (U.S.S.G. § 5H1.1), her education and vocation skills (U.S.S.G. § 5H1.2), her mental and emotional condition (U.S.S.G. § 5H1.4), her employment record (U.S.S.G. § 5H1.5), or her family ties and responsibilities (U.S.S.G. § 5H1.6). The former mandatory guideline system's prohibition of considering these factors cannot be reconciled with the requirement in § 3553(a)(1) that the court evaluate the "history and characteristics" of the defendant. The only aspect of a defendant's history that the former mandatory guideline system permitted courts to

consider was criminal history.  Thus, for defendants like Mrs. Kallen-Zury, whose history and character are highly positive, consideration of all of the § 3553(a) factors indicates that a sentence outside and below the advisory guideline range is appropriate.  Applying the facts of the case and information about Mrs. Kallen-Zury to the sentencing factors in § 3553(a) yields numerous grounds supporting what has been called a "guidelines variance" but is better termed a "statutory sentencing application."  These include, as identified above:

1.  Mrs. Kallen-Zury unblemished history of lawful behavior.  *See, e.g. United States v. Lam*, 20 F.3d 999, 1003-05 (9th Cir. 1994).

2.  That Mrs. Kallen-Zury child and other family considerations, including her elderly mother for whom she cares make incarceration inappropriate.  *See, e.g. United States v. Leon*, 341 F.3d 928 (9th Cir. 2003).

3.  The fact that prison time impacts a person like Mrs. Kallen-Zury (i.e. a first time offender) more significantly.

4.  That imprisonment is inappropriate for first-time offenders like Mrs. Kallen-Zury where the crime is non-violent.

5.  Mrs. Kallen-Zury's otherwise outstanding character and the absence of risk of recidivism.  *See, e.g., United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb 3, 2005).

6.  That too long a sentence would impair rehabilitation and is contrary to interests of restitution.  *See, e.g. United States v. Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993).

## ADVISORY GUIDELINES ANALYSIS AND OBJECTIONS TO PSR

### I.    Introduction

Guidelines and sentencing analysis, even in the era of "advisory guidelines," call for a two-step analysis.  First, the Court should consider what is the proper guideline calculation. Second, the Court should consider departures.  Whether to depart from the sentencing guidelines is a decision which requires a district court to make both factual and legal findings. Under 18 U.S.C. § 3553(b), a district court may depart from the applicable guideline range if "the court

finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Thus, to depart from the sentencing guidelines, a district court must make two fundamental determinations: (1) what, if any, factor makes the case "atypical" (*i.e.*, unlike the typical case found under the applicable sentencing guideline), and (2) should that factor result in a different sentence. (*Koon v. United States*), 518 U.S. 81, 91 (1996). The first of these determinations is factual in nature, *Id.* at 97, while the second involves both legal and factual considerations, *Id.* at 98.

Cases implicating a factor not adequately taken into consideration by the Sentencing Commission are said to fall outside the "heartland" of typical cases embodying the conduct described in the applicable guideline. *See* U.S.S.G. ch.1, pt. A, intro. comment. 4(b). A district court determines whether a case falls outside the heartland by making a refined assessment of the facts of the case and comparing those facts to the facts of other cases falling within the guideline's heartland. *See Koon*, 518 U.S. at 82.  The instant case falls outside the heartland of cases because of the unique facts herein regarding Mrs. Kallen-Zury.

## II.      Objections to the PSR (Non-Guidelines)

As to page two and paragraph 99 and 100, Mrs. Kallen-Zury objects to the claim that the maximum statutory fine in this case is $78,710,656.  The objection is not to 18 USC § 3571(d), which allows a maximum statutory fine equal to twice the pecuniary loss in the offense, but to the amount of loss alleged by the Government. Mrs. Kallen-Zury's argument regarding any loss in this offense is addressed as an objection to the application of the guidelines.

Related to the above, Mrs. Kallen-Zury  also objects to paragraphs 26 and 101 of the PSR and the amount of restitution, since the amount of restitution is directly tied to the pecuniary loss

used to determine the statutory fine.

Mrs. Kallen-Zury objects to Paragraphs 4 through 19 and Paragraph 20. Mrs. Kallen-Zury pled not guilty in this case and proceeded to trial. She continues to deny knowingly being involved in this conspiracy; and therefore, she objects to these paragraphs in their entirety. Further, we object to the failure to include the defense's version of the facts in the Presentence Report. To the extent paragraphs 4 through 19 are at odds with the defense version, we object.

Paragraph 52 incorrectly identified Mrs. Kallen-Zury's maiden name. Mrs. Kallen-Zury's mother's maiden name is Richman.

## IV.    Objections to PSR (Guidelines Issues)

### A.    Loss

Paragraphs 20, 26, and 33. Mrs. Kallen-Zury objects to the claim that the loss in this case is more than $50,000,000, but not more than $100,000,000, and requires a 24-level enhancement, pursuant to 2B1.1(b)(1)(M). Pursuant to 2B1.1, comment (n. 3(F)(viii), "Special Rules," in a federal health care offense, the amount of fraudulent bills submitted to the Government health care program shall constitute *prima facie* evidence of the intended loss, if not rebutted.[6] Mrs. Kallen-Zury offers the following in rebuttal.

The claim that $67,000,000 in billings represents the "loss" under the guidelines is without merit. First, it represents neither the actual loss nor the intended loss; neither the actual harm nor the intended harm. It is an amount that was "impossible" to have ever been realized and an amount people experienced with third-party medical billing would never have expected to

---

[6]   This subsection became effective November 1, 2011 (see Amendment 749 of the Guidelines), when, according to Count One of the Indictment, at paragraph 2, more than 90 % of the offense had been completed. The Amendment states, "The special rule includes language making clear that the government's proof of intended loss may be rebutted by the defendant."

realize.  Simply put, Medicare never pays what is billed.  Moreover, an examination of any health care provider's  billing records and the Medicare Billing Procedures under the CMS-1500 Medicare Reimbursement Claim Form clearly indicate that health care providers (both legitimate and illegitimate)  bill Medicare at the "usual customary rate" (UCR) and not the "allowable" rate, since UCR rates are more uniform and allowable rates vary by provider and even location.   For instance, in Dkt. No. 07-20291-CR-ALTONAGA, the evidence was that Medicare was billed for oxygen at a rate of $350, the allowable rate was $199, and payment of $159, or 80 % of the "allowable" rate, but only 45% of the billed rate. Other billings by health care providers have similar results, payments of   up to 60% of the billed amount, but always 80% of the "allowable" amount. This is common  occurrence  in  both  legitimate  and  fraudulent  third-party  medical reimbursement. Neither an actual loss nor an intended loss in the neighborhood of $67 million was possible in this case.  As a starting point, the funds actually received (i.e. less than $40 million) should be considered.  Those funds, however, paid for many services actually rendered.

Relevant  case  law  supports  the  imposition  of  a  variant  sentence  under  the  atypical circumstances of this case.  Even under the mandatory guidelines regime, a departure where the loss  overstated  substantially  the  culpability  of  individual  defendants  was  an  "encouraged" ground for departure.  *See* U.S.S.G. § 2B1.1 Application note 19(C).  Courts have departed and/or varied in many cases where the criminal conduct initially was not organized and implemented specifically as a fraudulent scheme by the defendants and/or the defendants did not directly benefit from the fraud or benefitted from it to a much lesser extent than the loss figure would otherwise indicate.  *See United States v. Hill,* 643 F.3d 807, 848 (11th Cir. 2011); *United States v. Broderson,* 67 F.3d 452 (2d Cir. 1995); *United States v. Nachamie,* 121 F.Supp. 2d 285 (S.D.N.Y. 2000); *United States v. Forchette,* 220 F.Supp 2d 914 (E.D. Wis. 2002); *United States*

*v. Costello,* 16 F. Supp. 2d 36 (D. Mass. 1998); *United States v. Jackson*, 798 F. Supp. 556 (D. Minn. 1992); *United States v. Schaffer*, 121 F. Supp.2d 29 (D.D.C. 2000); *United States v. Walters,* 87 F.3d 663 (5th Cir. 1996).

In *United States v, Hill,* 643 F.3d 807, 848 (11th Cir. 2011), the Eleventh Circuit affirmed the sentence of an appraiser in a mortgage fraud scheme with a total loss of over $4 million.  She earned not a single penny as a result of her participation in the scheme.  The defendant, a first-time offender, faced a sentencing range of 63-78 months.  Acknowledging "her extraordinary lack of profit" and "how the amount of loss grossly overstated her criminal conduct compared to that of the other defendants," she was sentenced to 5 months imprisonment.  *Id.*

Similarly, in *United States v. Gupta*, Slip Op., 11 Cr. 907 (JSR), (S.D.N.Y. October 24, 2012), the Court grant a large variance from the sentencing guidelines in a case involving a conviction for conspiracy and three counts of substantive securities fraud.  In Gupta, the court noted that from the onset, the sentencing guidelines have deviated from their intended role to avoid disparities in sentencing.  *Id*. at 2.  The court further noted that in white collar cases there has been a vast increase in sentencing and it is all tied to factor – the amount of monetary loss or gain occasioned by the offense.  *Id*. at 4.  The court stated that this has guaranteed most sentences to be irrational on their face.  *Id*. at 5.  The court stated that the instant case was a perfect example of the irrational guidelines wherein the Government and Probation were arguing a level 30, where the gains were tied to the companies' monetary gain and not the defendant.  *Id*. Like *Gupta*, the loss advocated by the Government and the number that drives the level 47 in this case, has nothing to do with what Mrs. Kallen-Zury earned, but an abstract figure tied to the amount billed to Medicare, which may or may not have been reimbursed.  And even if the amount is tied to the amount reimbursed by Medicare, it is equally irrational because that number

does not correlate with the alleged "bad conduct", i.e., those reimbursements included money received for legitimate services and money not put in Mrs. Kallen-Zury's pocket.

We advocate a loss computation that looks either to gain by Mrs. Kallen-Zury or to the monies paid to the so-called "patient brokers." "Loss" in this case is a number far less than even $39 million figure that represents monies received at Hollywood Pavilion. We object to a loss amount in an amount more than $50 million and the 24 level enhancement.

## B.      Mass Marketing, Vulnerable Victims, and Large Number of Vulnerable Victims

We object to the 2-level enhancements for (each) mass marketing, vulnerable victims, and a large number of vulnerable victims, §§ 2B1.1(b)(2)(A)ii) and 3A1.1(b)(1) and (b)(2) paragraphs 34, 37, and 38. The enhancements are related, cumulative, and amount to a total enhancement of 6-levels. According to the "Sourcebook," the vulnerable victim enhancement was applied in just 0.4 % of all cases FYE 2012. The enhancement for a large number of vulnerable victims is unmeasurable, just 15 of 74,069 cases in which the Sentencing Commission received sentencing data. These enhancements do not apply in this case.

Application of §3A1.1(b)(1) requires that the defendant knew, or should have known, that a victim of the offense was a vulnerable victim. First, a vulnerable victim must be a person who is a victim of the offense, §3A1.1, comment. (n.2). Pursuant to §2B1.1, comment. (n.1), a "victim means (a) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense."[7]

---

[7] To be counted as a victim, a person must suffer pecuniary loss, *United States v. Miller*, 588 F. 3d 560 (8th Cir. 2009) (without proof of actual loss, there could be no victims for the purposes of numerous victims enhancement). Where defendant used Medicaid numbers of over 2000 people to submit phony claims for mental health services, the Medicaid subscribers whose numbers were used suffered no monetary loss and thus were not "victims" for purposes of this enhancement. *United States v. Sutton*, 582 F. 3d 781 (7th Cir. 2009).

Finally, for a victim to be a vulnerable victim, "the person must be unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Again, §3A1.1, comment. (n.2).

> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability.  The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim.

The victim of this offense is the Centers for Medicare and Medicaid Services. (See paragraph 26 of the PSR.)  No other victims, let alone vulnerable victims, have been identified, none ever testified at trial, and the provisions of 18 U.S.C. § 3664 were not pursued by either the government or the probation department to solicit victim impact statements from any victim, let alone a vulnerable victim.

Patients in this case were neither victims nor vulnerable victims. Marketing to patients in need of medical services was begun 2001 by Mrs. Kallen-Zury's father at a time when she had stepped back from her full-time position with both the hospital and nursing home to spend more time with her sons, who had been diagnosed with ADHD.  Mrs. Kallen-Zury did not return to full-time status until her father died and, in a sense, she inherited her father's marketing initiatives.  She continued those initiatives, improved upon them, implemented  programs to increase productivity and moral, created a well-defined organizational chart encompassing an executive staff, middle managers, and its 250+ employees. Hollywood Pavilion was a real place, a real medical facility, a real business which underwent regular audits and posted great reviews. Hollywood Pavilion's patients were equally real.  They were never victims, by any definition, let alone vulnerable victims as defined by the law.

The overwhelming majority of patients who came to Hollywood Pavilion for treatment

had already been dual diagnosed; in other words, they had previously seen doctors, they had been previously  diagnosed with both mental health and substance abuse conditions, and they previously had some experience with treatment. We know this because they were already Medicare patients, and they became beneficiaries not because of their age, but because of their disability that another doctor, at a previous time, had found they were entitled to.  And once they entered Hollywood Pavilion, they were screened, one of the seven to ten doctors on staff at Hollywood Pavilion examined them, a treatment plan was created, and they received treatment. They were not victims and certainly not vulnerable victims – they were patients receiving treatment.

It appears there was a much smaller group of patients who, admittedly, were "professional"' patients.  These were individuals who knew what to say or were coached as to what to say and knew what to do to take advantage of the system, to receive benefits from the hospital which also included a heated or air conditioned environment, three meals a day, and a clean, safe place to spend their time.  Such "professional" patients were not unique to Hollywood Pavilion.  They occur, at times, when attempting to treat people with mental illnesses and substance abuse.  However, such "professional" patients may not be regarded as either victims or vulnerable victims when they are also "participants" in the offense. *See* §3B1.1, comment. (n.1).

In sum, there were no victims in this case except what has been identified in paragraph 26 of the PSR, there were no vulnerable victims, as defined by §3A1.1 and its commentary, and there was no mass marketing. Therefore, the cumulative 6-level enhancement does not apply in this case.

### C.      Enhancement related to healthcare fraud.

Mrs. Kallen-Zury objects to the 4-level enhancement because the offense involved a

Government health care program and the loss was more than $20,000,000, §2B1.1(b)(8)(A), (B)(iii) in paragraph 35. This 4-level enhancement, which significantly raises the *advisory* guideline range in this case, was not enacted until November 1, 2011, when, according to Count One, paragraph two of the Indictment, more than 90 % of the offense was completed. The enhancement is part of Amendment 749 to the Guidelines, and was in direct response to §10606(a)(2) of the Patient Protection and Affordable Care Act of 2010. It effectively double-counts losses in health care offenses by employing the loss table in §2B1.1 twice. We object to this enhancement because it over-penalizes Mrs. Kallen-Zury.

**D.      Sophisticated means**.

Mrs. Kallen-Zury objects to the 2-level enhancement for sophisticated means, §2B1.1(b)(10)(C) in paragraph 36. Effective November 1, 1998, the Sentencing Commission added a two-level enhancement for sophisticated means as a temporary emergency amendment to the since deleted fraud guideline of §2F1.1. The enhancement was made permanent and incorporated into the new economic crime guideline (see Amendment 617, effective November 1, 2001), now renumbered as §2B1.1(b)(10). Previous to the creation of this guideline, both § 2B1.1 and §2F1.1 provided a two-level enhancement for more than minimal planning ("MTMP"), defined in §1B1.1, comment. (n.1(f)), as more planning than is typical for commission of the offense in a simple form,  significant affirmative steps  taken to conceal the offense, or in a case involving repeated acts over a period of time. This section of the guidelines offer that "in an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning; however, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute MTMP. However, amendment 617 effectively eliminated the MTMP enhancement. The result was that

offenders who were accountable for relatively low loss amounts received slightly lower offense levels, but by increasing the number of offense levels the loss table for offenders involved in a moderate to high loss amount, even with the elimination of the MTMP enhancement, these offenders faced an increase in offense levels.  The reasoning behind the elimination of the MTMP enhancement was that MTMP almost always existed in offenses involving moderate to high loss amounts and so its elimination obviated the need for judicial fact-finding about this frequently occurring enhancement. Further, it avoided the potential overlap between the MTMP enhancement and the sophisticated means enhancement, clearly elevating the bar of the latter's application standard.

The definition of sophisticated means has remained largely unchanged since its inception. The enhancement is reserved for "especially complex" or "especially intricate" offense conduct pertaining to the execution or concealment of the offense.  A telemarketing scheme would not necessarily involve sophisticated means (though it probably would involve MTMP); however, if the main office of the scheme was located in one jurisdiction and the soliciting operations were in another, this would ordinarily indicate sophisticated means.  Simple Medicare fraud or even mortgage fraud probably would involve MTMP; however, if assets or transactions were hidden through the use of fictitious entities, corporate shells, offshore bank accounts or even co-conspirators who assumed false identities, the fraud would be found to be "especially complex" or "especially intricate" and require the sophisticated means enhancement.

That is not the case here.  Even accepting the Government's allegations at trial, the fraud here only employed basic and typical steps.  Assets and transactions were not hidden, and fictitious entities, shell corporations or offshore financial accounts were never created (*see* §1B1.1, comment. (n. 8). Rather, Hollywood Pavilion treated thousands and thousands of

patients, maintained thousands of medical records, and had contracts with many staff members, including marketers and case managers.  Hollywood Pavilion's books were open, and the hospital kept track of who referred patients; not just marketers, hospitals, courts, mental health clinics, doctors, and word-of-mouth.  Nothing was hidden.  Nothing was sophisticated.

Of further note is commentary note 8(C) of this section.  "If the conduct that forms the basis of this enhancement under subsection (b)(10) is the only conduct that forms the basis for an adjustment under §3C1.1, do not apply that adjustment under §3C1.1."  In other words, the Government's position that there were vulnerable victims, that there were many vulnerable victims, cannot form the basis for enhancements under both § 2B1.1(b)(10) and §3C1.1.

In sum, the relevant conduct in this case does not meet the standard for employing the sophisticated means enhancement because fictitious business entities, doctor fax headers and phony email addresses were not used  (*United States v. Jackson,* 346 F. 3d 22 (2nd Cir.  2003), and complex methods both in executing and concealing the scheme were not used (*United States v. Jones*, 530 F. 3d 1292 (8th Cir.  2008). This offense involved MTMP, which has been incorporated in the higher loss amounts reflected in the loss table, but not sophisticated means. Therefore, the two level enhancement should not apply and paragraph 36 of the PSR should be deleted.

### E.     Role

Mrs. Kallen- Zury objects to the 4-level enhancement for role, §3B1.1(a) in paragraph 39. Section 3B1.1(c) requires the defendant to be an organizer, leader, manager, or supervisor in any criminal activity.  According to *United States v. Ronning*, 47 F.3d 710, 711-12 (5th Cir. 1995), U.S.S.G. § 3B1.1(c) requires that the defendant be the organizer or leader of at least one other participant in the crime and that he assert control or influence over at least that one participant.

In this case, Mrs. Kallen-Zury submits that she did not organize the criminal activity even though she was the Chief Executive Officer of Hollywood Pavilion.

Furthermore, it is not sufficient for the defendant to have control or influence over legal activity, but only illegal activity. For example, in *United States v. Jobe*, the Fifth Circuit vacated the defendant's § 3B1.1(c) enhancement because although the defendant directed two banks involved in a check kiting scheme, the court found no evidence that the defendant managed or supervised any of his codefendants or any other people in connection with the illegal acts. 101 F.3d 1046, 1065 (5th Cir. 1996). Likewise, in *United States v. DeGovanni*, the court found that the fact that the defendant was a sergeant in the police department and an overall supervisor of other police officers in the discharge of general police functions was not sufficient to substantiate an enhancement for active supervision of other members of the conspiracy under § 3B1.1(c). The same result should apply here, where Mrs. Kallen-Zury may have had some control or influence, but she did not control clinical decisions at Hollywood Pavilion. She did not control billing. She signed contracts prepared by and reviewed by lawyers. She does not qualify as a leader or organizer.

### F. Downward Departure

Mrs. Kallen-Zury objects to the failure to identify any factors that may warrant a departure from the *advisory* guideline range in this case. A downward departure is warranted from the *advisory* guideline range, pursuant to §5K2.0, Grounds for Departure (policy statement). This may also be considered as a sentencing factor under 18 U.S.C. § 3553, the nature and circumstances of the offense.

Courts have the discretion to depart downward in cases like the present one where the offense level is pegged to a numerical figure, such as the amount of loss inflicted, and the

resulting offense level overstates the seriousness of a defendant's conduct. *See* 18 U.S.C. §

3553(b); U.S.S.G. § 2F1.1, comment (n.11); U.S.S.G. § 5K2.0. This is true regardless of

whether the defendant is eligible for a downward adjustment under U.S.S.G. § 3B1.2.

In *United States v. Restrepo*, 936 F.2d 661 (2d Cir. 1991), the Second Circuit affirmed a

downward departure for three money laundering defendants whose criminal activity bore "little

relation" to the amount of money laundered. *Id*. at 667. The three defendants were paid only to

load boxes of money at a warehouse. *See id*. at 667. The amount involved in the offense was

$18.3 million, the amount of money seized at the warehouse when federal agents raided it. *See

id*. at 664. The court concluded that there was little or no "connection between the quantity of

money implicated and the extent of [the defendants'] participation in the offense." *Id*. at 667.

The defendants in *United States v. Dorvil*, 784 F. Supp. 849 (S.D. Fla. 1991) were

convicted of various offenses related to their part in smuggling 237 kilograms of cocaine from

Haiti to Miami. Finding that the defendant crewmen were totally unaware of the cargo until after

they reached Miami, *See id*. at 850 & n.1, 851, the Court held that the four-point reduction in

offense level for minimal participation pursuant to U.S.S.G. § 3B1.2(a) was insufficient given

their very limited involvement in the scheme:

> Even after [the defendants'] offense level is adjusted for their minimal
> participation, the applicable level, tethered as it is to cocaine amount, does not
> adequately reflect the minimal nature of their roles. … [W]e conclude that
> departing on the basis of the defendants' unusually minimal participation is
> consistent with the goals of the Sentencing Guidelines.

*Id*. at 854 (citing U.S.S.G. § 5K2.0 and *Restrepo*). This reasoning applies equally to Mrs.

Kallen-Zury who had a limited involvement in the crime.

Other courts have also approved *Restrepo*. In *United States v. Stuart*, the Third Circuit

held that "[w]here application of the Guidelines' monetary tables bears little or no relationship to

the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward." 22 F.3d 76, 83 (3d Cir. 1994). In *Stuart*, the defendant was found guilty of receiving stolen federal property for his part in a scheme to sell stolen U.S. savings bonds valued at $129,000. *See id*. at 79. His role was to carry the bulk of the bonds to the place of the sale and to stay out of sight until signaled to produce them. *See id*. at 79. The Third Circuit noted that, regardless of whether the defendant met the § 3B1.2 requirement for a decrease in offense level, "a nine-level enhancement under these circumstances may well overstate both the degree of Stuart's criminality and his need to be corrected." *Id*. at 82.

Likewise, the court in *United States v. Costello*, 16 F. Supp. 2d 36, 37 (D. Mass. 1998), departed downward six points in sentencing two defendants charged with conspiring to steal computer discs, compact discs, and computer software from their employer. *See id*. at 40. After an evidentiary hearing, the court determined that the amount of the loss was $20,859,523. The judge, however, found that the two defendants received only about 1% of the value of the goods, with a third conspirator organizing the theft and keeping the major part of the proceeds. *See id*. at 39. Recognizing that under such circumstances the amount of loss was not, as the guidelines assume, an appropriate proxy for culpability, the court departed downward by six levels. *See id.; see also United States v. Jackson*, 798 F. Supp. 556, 557 (D. Minn. 1992) ("The court finds departure is proper because the offense level is extraordinarily exaggerated by the dollar value involved in that the defendant was a minimal cause of the $1.4 million loss.")

As these decisions illustrate, a sentencing court must examine the particular circumstances surrounding each individual defendant's participation in the crimes charged. If the guidelines' assumption that the amount of losses claimed to exist in the PSR is indicative of Mrs. Kallen-Zury's culpability is contradicted by the facts of the case, the Court should depart

downward:

> The United States Sentencing Commission, *Guidelines Manual* § 2B1.1 (Nov. 1997), points me first to the value of the loss to the victim, under the general theory that the amount of loss is an appropriate proxy for the gravity of the defendant's offense. But that is not the end of the analysis. I am obliged to look at the specific facts of the case before me, the human beings involved, the nature of the charges, and the circumstances of the offense to determine whether the factual circumstance I confront are "of a kind or to a degree not adequately taken into account by the Sentencing Commission."

*Costello*, 16 F.Supp.2d at 37.

The recent amendments to the sentencing guidelines (April 30, 2012) acknowledge the seriousness of this issue as it relates to securities fraud cases. Application note 19(c) provides that a downward departure may be warranted if the offense level substantially overstates the seriousness of the offense. The new amendment adds an example of a case in which such a departure may be appropriate:

> The example provides that "a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims,: and that, "in such a case, the loss table in subsection (b)(1) and the victims table subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense." This part of the amendment responds to concerns raised in comment and case law that the cumulative impact of the loss table and the victims table may overstate the seriousness of the offense in certain cases.

Amendments notice at page 5. Although the instant case is not a securities fraud case, this same reasoning applies.

In the instant case, a downward departure from the advisory guidelines score is warranted because Mrs. Kallen-Zury's conduct falls outside the heartland of Medicare fraud offense and the mathematics of "loss" as computed in the Presentence Report produce an unfair and draconian sentence.

The circumstances stated above, taken either separately or collectively with other 18 USC §3553 sentencing factors offered  in this memorandum, represent a mitigating circumstance of a kind, or to a degree, that have not been adequately taken into consideration by the Sentencing Commission in formulating the guidelines, §5K2.0.

## IV.     Recommendation

Karen Kallen-Zury respectfully asks that this Court consider all of her arguments and the factors of 18 U.S.C. § 3553(a), and impose a "reasonable" but not greater than necessary sentence. Regardless of how this Court resolves issues relating to the advisory guidelines here, we urge the Court to grant a variance to Mrs. Kallen-Zury and to impose a sentence of no worse than home confinement.

Respectfully submitted,

/s/ Bruce Rogow
Bruce S. Rogow
Florida Bar No. 67999
Email: brogow@rogowlaw.com
Tara A. Campion
Florida Bar No. 90944
Email: tcampion@rogowlaw.com
Bruce S. Rogow, P.A.
500 E. Broward Blvd., Suite 1930
Ft. Lauderdale, FL 33394

/s/ Michael Pasano
Michael S. Pasano
Florida Bar No. 475947
E-mail: mpasano@carltonfields.com
Marissel Descalzo
Florida Bar No. 669318
E-mail: mdescalzo@carltonfields.com
CARLTON FIELDS
100 S.E. 2nd Street, Suite 4200
Miami, Florida 33131-2114
Telephone: (305) 530-0050
Facsimile: (305) 530-0055
Attorneys for Defendant Karen Kallen-Zury

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 6, 2013, I electronically filed the foregoing with the Clerk of the Court by using CM/ECF, which will then serve all parties in the case using CM/ECF.

/s/ Michael Pasano

## SERVICE LIST

Ron Gainor
150 W. Flagler Street
Suite 2701
Miami, FL 33130
Attorney for Christian Coloma

Robert Zink
Trial Attorney
U.S. Department of Justice
Criminal Division – Fraud Section
1400 New York Avenue, N.W.
Washington, DC 20005

Adam T. Dougherty
Law Offices of Adam T. Dougherty, P.A.
2 South University Drive, Suite330
Plantation, FL 33324
Attorney for Daisy Miller

Bruce Zimet, Esq.
One Financial Plaza
Suite 2612
Ft. Lauderdale, FL 33394
Attorney for Michelle Petrie

Andrew H. Warren
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice
1400 New York Ave., NW
Washington, DC 20005

Aaron Danzig
Sara M. Lord
Karen B. Bragman
Arnall Golden Gregory
2 S. Biscayne Blvd., Suite 2690
Miami, FL 33131
Attorneys for Hollywood Pavilion